IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CONCO, INC.,

          Plaintiff,

v.                                    Case No.  24-01078-JWB

NAPCO PRECAST, LLC,

          Defendant.

## MEMORANDUM AND ORDER

This matter is before the court on cross motions for summary judgment. (Docs. 83, 85.) The motions are fully briefed and ripe for decision.  (Docs. 84, 86, 87, 88, 90, 97, 98.)  Plaintiff's motion for summary judgment is DENIED and Defendant's motion for summary judgment is GRANTED for the reasons stated herein.

### I.    Facts

This case belongs in a first-year law student's contracts textbook.  The parties before the court quarrel over the proper application of some of the most foundational principles of contract law.  Plaintiff Conco, Inc. (hereinafter "Conco" or "Plaintiff") is a general contractor based in Wichita, Kansas.  (Doc. 81 at 2.)[1]  In 2021, Conco was selected to be the prime contractor on the construction of the Lumen apartment complex in Bentonville, Arkansas.  (*Id.* at 4, 2.)  As part of its bid on the apartment complex, Conco entered negotiations with Defendant NAPCO Precast, LLC (hereinafter "NAPCO" or "Defendant") for a subcontract under which NAPCO would construct a parking garage.  (*Id.* at 2-3.)  NAPCO is based in San Antonio, Texas.  (*Id.* at 2.)

---

[1] The court notes that all page number citations to the record reference the ECF-assigned pagination at the top of each page of documents filed with the court.

The parties' interactions began when Conco decided that, as part of its design for the garage, it would use precast concrete slabs instead of post-tensioned concrete. (*Id.*) This was done as a cost saving measure. (*Id.*) Precast concrete involves the fabrication of "component pieces specific to the requirements of a particular [p]roject" through "forms or molds" with "reinforcement . . . placed within." (*Id.*) After the slabs are "cur[ed]" each slab is transported to the job side and "erect[ed]." (*Id.*) This stands in contrast to post-tensioned concrete, which is poured around steel wires. (*Id.*) The steel wires are "tensioned" after the concrete has "gained sufficient strength." (*Id.*) Defendant NAPCO Precast, hence the name, produces precast concrete structures. (*Id.*)

On February 2, 2021, Conco contacted Mark Carr, a NAPCO employee, to begin discussing a possible NAPCO bid for the precast work. (*Id.*) In the ensuing spring and summer, Conco and NAPCO exchanged information to begin crafting "estimates and proposals" for the project. (*Id.*) On June 9, 2021, Carr sent Conco its first proposal for the parking garage. (*Id.* at 3.) The total value of the proposal was for $1,984,500.00. (*Id.*) Carr submitted a revised proposal for $1,667,000.00 on June 24, 2021. (*Id.*) NAPCO was the only precast contractor to submit a bid on the project at this stage. (*Id.*) Still, in August 2021, Conco did receive an estimate from another contractor, Coreslab, to enable Conco to cost check NAPCO's proposal. (*Id.*) Finally, on September 9, 2021, Mark Carr submitted another proposal to Conco totaling $1,698,260.00. (*Id.*) The proposal included an option for an additional $227,570.00 for NAPCO to build a "precast ramp" into the parking garage. (*Id.*) The proposal contained "information regarding the scope of work, terms, conditions, and details as set forth in the document itself, including but not limited to the express term that the [] proposal was 'valid for 60 days.'" (*Id.*) In theory, this would mean that the last day Conco could accept would be November 8, 2021. *See* (*id.*)

Conco, relying upon NAPCO's proposal, submitted a bid for the prime contract at the apartment complex that included a $1,698,260.00 cost item for the parking garage. (*Id.*) From this time through November 2021, Conco negotiated with the apartment complex's project owner. (*Id.*) Multiple proposals were "revis[ed] and resubmit[ed]" by Conco to the owner during this period. (*Id.*) Those prime contract proposals relied upon NAPCO's September 9, 2021, subcontract proposal. (*Id.* at 3-4.) On "November 9, 2021, the 60-day period stated in the [September 9, 2021, NAPCO subcontract] proposal as to how long the proposal was valid expired without any communication from Conco to Carr accepting the proposal." (*Id.* at 4.) On that day, Carr followed up with Conco. (*Id.*) No response was received until November 18, 2021. (*Id.*) Conco replied that it was still "working through contract negotiations with the owner" and was "[h]oping to have [its] contract executed in the next couple weeks." (*Id.*) Conco also advised that at that point it would "get the schedule dialed in and start working on our subcontractor/vendor commitments." (*Id.*)

Carr replied to Conco asking if NAPCO could receive something in writing, like a letter of intent, to indicate that Conco was committing to NAPCO as its subcontractor for the parking garage. (*Id.*) Carr specifically indicated that he needed this "by or before the end of December" to "hold pricing." (*Id.*) "Conco did not respond in writing to this email or [NAPCO's] proposal until January 2022." (*Id.*)

Conco was eventually awarded the apartment complex's prime contract on December 2, 2021. (*Id.*) The prime contract included a cost line item for "Parking Garage Precast" valued at $1,698,260.00. (*Id.*) The apartment complex was scheduled to be completed by November 12, 2023. (*Id.*) Conco did not inform NAPCO that it had been awarded the prime contract until over a month had passed. (*Id.*) On January 4, 2022, NAPCO's Mark Carr wrote to Conco asking for

an update.  (*Id.*)  It was then that Conco's project manager Robert Davis, wrote back saying that Conco had "a signed contract with the owner."  (*Id.*)  Davis told Carr that Conco was awaiting the release of funding, at which point a letter of intent would be issued while the parties finalized a subcontract.  (*Id.*)  Carr replied ebulliently.  (*Id.* at 4-5.)

Later, a design change required that NAPCO update its price.  (*Id.* at 5.)  On January 17, 2022, Conco told Carr that the funding had been received and asked NAPCO to "accept this email as our letter of intent to award this project to you."  (*Id.*)  Conco also asked NAPCO to "please begin [the detailed] design process ASAP."  (*Id.*)  Conco further asked NAPCO to "[p]lease clean up your number to eliminate the exterior ramp and place it internal[]", and told NAPCO that as soon as he received NAPCO's updated price he would issue the subcontract.  (Doc 84-11 at 2.) On February 2, 2022, NAPCO sent Conco a new proposal totaling $1,860,118.00 plus an optional addition of $136,776.79 for a mechanical room.  (Doc. 81 at 5.)  On the same day, Davis responded[2] saying "[f]rankly, the $160k add to the main garage is a problem."  (*Id.*)  Conco's budget anticipated that the aforementioned design changes would "reduce" the price.  (*Id.*)  On February 15, 2022, Conco followed up with NAPCO, asking "[w]here do we stand on improving the number here."  (*Id.*)

On March 15, 2022, NAPCO sent Conco a "Notice to Proceed" for the design work for "Drafting and Calculation work necessary to provide Gravity Loads."  (*Id.*)  On March 21, 2022, Davis signed this notice on behalf of Conco and returned it to NAPCO and noted "subcontract coming this week."  (*Id.*)  On April 5, 2022, NAPCO sent Conco various submissions as part of their design work.  (*Id.*)  On May 16, 2022, NAPCO sent Conco links to NAPCO's "calculations, drawings, and sections for review and approval."  (*Id.*)  NAPCO then invoiced Conco $50,877.67

---

[2] The stipulated fact in the pretrial order says "Carr responded" but that would make no sense given the context, so the court assumes that the parties meant Davis, Conco's project manager.

for engineering services. (*Id.* at 6.) Conco paid NAPCO $46,377.67 for those services. (*Id.*) NAPCO sent a receipt on June 24, 2022, for this payment. (*Id.*)

On June 16, 2022, NAPCO sent Conco a change order that increased the price of its proposal for the parking garage to $2,703,210.00. (*Id.*) From this point until the end of July 2022, NAPCO received no communications from Conco about either the price increase or the "subcontract redlines." (*Id.*) On July 29, 2022, NAPCO sent a "notification of stop production letter" to Conco. (*Id.*) That letter stated:

> Unfortunately, we have not received any feedback on submitted price increase even though we made numerous attempts by phone and emails. We value our relationship with Conco, however without feedback on our price by August 3rd, we will assume that you don't want the project to move forward and remove Lumen [the apartment complex] from our production schedule. Our next available production slot will be 3rd or 4th quarter of 2023.

(*Id.*) Around August 8, 2022, Conco communicated with an alternative supplier, the previously mentioned Coreslab. (*Id.*) Conco also communicated with the project owner about changes from precast concrete to a post-tension design. (*Id.*) On August 15, 2022, NAPCO provided requested documentation to Conco that supported the price increase. (*Id.*) On August 19, 2022, NAPCO resubmitted its proposal, valued at $2,703,906.67. (*Id.* at 6-7.) Between August and September of 2022, Conco had communications with other alternative subcontractors. (*Id.* at 7.) Finally, on September 9, 2022, Conco sent NAPCO a termination for default notice. (*Id.*)

Plaintiff Conco initiated this lawsuit on May 10, 2024. (Doc. 1.) Defendant NAPCO answered and filed a counterclaim. (Doc. 14.) This court entered a pretrial order on June 26, 2025. (Doc. 81.) After entry, Plaintiff's claims are two counts: (1) for breach of contract; and (2) in the alternative, promissory estoppel. (*Id.* at 15-16.) As its principal defense, NAPCO contends that no contract was ever formed. (*Id.* at 18.) NAPCO counterclaims in the alternative to its defenses and contends that if a contract was formed, it is Conco who breached that contract when it decided

to wrongfully terminate NAPCO for default.  (*Id.* at 19.)  For its losses, Plaintiff requests $1,763,554.21 in damages plus interest.  (*Id.* at 19-20.)  If NAPCO succeeds on its counterclaim, it seeks lost profits plus interest.  (*Id.* at 21.)  Both parties have moved for complete summary judgment on their claims.  (Docs. 83, 85.)  The court addresses the motions below.[3]

## II.    Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit.  A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented."  *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (quoting *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015)).  Conclusory allegations are not sufficient to create a dispute as to an issue of material fact.  *See Hall*, 935 F.2d at 1110. The court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

In considering a motion for summary judgment, the facts set forth in the motion must refer "with particularity to those portions of the record upon which" the moving party relies.  D. Kan. R. 56.1(a).  "All material facts set forth in the statement of the movant will be deemed admitted

---

[3] Plaintiff Conco had some trouble properly submitting its exhibits with its motion for summary judgment.  The court permitted refiling of its exhibits.  (Doc. 95.)  After this, Defendant alleged that Plaintiff again failed to properly file certain exhibits and moved for the misfiled exhibits to be struck from Plaintiff's summary judgment motion.  (Doc. 97 at 1.)  Defendant has also moved for the court to deem admitted certain facts where Plaintiff's response to the Defendant's statement of facts included reference to Plaintiff's own statement of facts in alleged violation of the local rules.  (Doc. 90 at 3-4.)  Because the court has been able to adequately address the parties' motions on the record presented, both motions are denied.

for the purpose of summary judgment unless specifically controverted by the statement of the opposing party." *Id*. To properly dispute a proposed statement of material fact, the opposing party must "refer with particularity to those portions of the record upon which the opposing party relies." D. Kan. R. 56.1(b)(1). Failure to properly controvert a proposed fact that is properly supported will result in a determination that the fact is admitted. *Coleman v. Blue Cross Blue Shield of Kansas, Inc*., 287 F. App'x 631, 635 (10th Cir. 2008) (finding that the "district court was correct to admit all facts asserted in [the movants] summary judgment motion that are not controverted by a readily identifiable portion of the record.") (internal quotation and citation omitted).

## III.    Analysis

The court addresses the parties' arguments in the following manner. First, the court provides an overview of the legal requirements for contract formation. Second, the court outlines the requirements to establish the breach of a formed contract. Third, the court addresses the proper application (or lack thereof) of the Uniform Commercial Code ("UCC"). Next the court evaluates the relevant offers that Plaintiff contends formed the basis for the alleged contract with Defendant. (Doc. 81 at 15.) Finally, the court addresses Plaintiff's promissory estoppel arguments. (*Id.* at 16.)

### A.    Formation of a Contract

In Kansas, and probably everywhere else, the requirements to form a valid contract, are three-fold: (1) there must be an offer; (2) an acceptance of that offer; and (3) valid consideration to support the agreement. *M West, Inc. v. Oak Park Mall, L.L.C.*, 234 P.3d 833, 844 (Kan. Ct. App. 2010) ("[A]ll the components of a valid contract are present: offer, acceptance, consideration[.]"). The presence of these three components evidences the required "meeting of the minds" of the parties. *Steele v. Harrison*, 552 P.2d 957, 962 (Kan. 1976). "[T]here must be a

7

fair understanding between the parties which normally accompanies mutual consent and the evidence must show with reasonable definiteness that the minds of the parties met upon the same matter and agreed upon the terms of the contract." *Id.* (citing 17 Am. Jur. 2d., Contracts, §§ 18, 19, pp. 354, 355; 17 C.J.S. Contracts § 31, p. 635).

"An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts § 24. The offer of a contract creates in the offeree, the power of acceptance. *Steele*, 552 P.2d at 962. Still, that power of acceptance is limited. An offeree may only accept the offer that was made, to include all its details. *Id.* "Any expression of assent that changes the terms of the offer in any material respect may be operative as a counter-offer, but it is not an acceptance and constitutes no contract." *Id.*; *see also* Restatement (Second) of Contracts § 35 (2) ("A contract cannot be created by acceptance of an offer after the power of acceptance has been terminated in one of the ways listed in § 36."). Moreover, "the offeror controls the handling of the offer." *Duling v. Mid American Credit Union*, 530 P.3d 737, 747 (Kan. Ct. App. 2022). This means that the offer itself "determines who may accept and *how*." *Id.* (citing Restatement (Second) of Contracts § 30, cmt. a (2022)) (emphasis added). Acceptance through silence, however, is generally not inferred. *Id.* If an offer is not accepted within "the time specified in the offer" or "if no time is specified, at the end of a reasonable time[]" then the offeree's power of acceptance is terminated. Restatement (Second) of Contracts § 41; *see also AVEMCO Ins. Co. v. Medicalodges, Inc.*, 752 F. Supp. 397, 398 (D. Kan. 1990).

## B.    Breach of a Contract

Once a contract has been formed, either party can be found in breach of the contract if said party fails to comply with the terms. Restatement (Second) of Contracts § 235. To properly

establish breach of contract, an injured party must demonstrate five elements have been met: "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach." *Stechschulte v. Jennings*, 298 P.3d 1083, 1098 (Kan. 2013) (citing *Commercial Credit Corp. v. Harris*, 510 P.3d 1322 (1973); PIK Civ. 4th 124.01).

### C.    The Uniform Commercial Code

Before diving into the crux of this case, there is one more wrinkle in contract law that the court must discuss. Every state has, at a minimum, enacted a portion of the Uniform Commercial Code. *Uniform Commercial Code Commercial Law Research Guide*, GEORGETOWN LAW LIBRARY (last updated May 2, 2025), https://guides.ll.georgetown.edu/commerciallaw/ucc. Article 2 of the UCC, which displaces certain portions of common law contract law, applies only to sales of goods. K.S.A. 84-2-102. Kansas' version of Article 2 defines "goods" as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action." K.S.A. 84-2-105. This definition plainly excludes from the statute's coverage contracts for services, construction, real property, and other intangible things or tangible things that are not "movable." *See Nicholson v. Harnett*, 277 P.3d 1193 (Table), 2012 WL 2149811 at *5 (Kan. Ct. App. Jun. 8, 2012); *see also* K.S.A. 84-2-105, Kansas Comment, 1996 ("Because Article 2 applies only to transactions in goods (84-2-102), it does not apply to the sale of real estate. Nor does it apply to construction contracts, employment contracts, or other contracts for the provision of services."). The application of the UCC has substantial implications as many of the provisions of the UCC differ from traditional common law principles of contract.

Some contracts though, include the provision of both goods and services. *Id.* Once the UCC is determined to apply, it applies to the whole of the contract, not merely the portion concerning the sale of goods. *See Golden v. Den-Mat Corp.*, 276 P.3d 773, 791 (Kan. Ct. App. 2012). When a "mixed or hybrid" contract of goods and services is at issue, many courts, including those in Kansas, use the "predominant purpose" test to determine whether the UCC will apply. *Id.* The predominant purpose test asks whether "the buyer [is] seeking services to which the goods are incidental, or is the buyer acquiring goods to which the services are auxiliary?" *Id.* (citing *Care Display, Inc. v. Didde-Glaser, Inc.*, 589 P.2d 599 (Kan. 1979)). If the buyer seeks primarily goods, then the UCC will apply, and vice versa. *Id.*

Here, the parties dispute whether the UCC applies. Plaintiff argues that the UCC does apply as the contract was a hybrid contract. (Doc. 87 at 27.) It contends that because NAPCO was selling movable precast concrete segments, the predominant purpose of the contract was the sale of goods. (Doc. 87 at 28.) It points to contractual language where NAPCO refers to what they're selling as "products." (*Id.*) It also claims that the actual erection of these segments into a parking garage was only a small portion of what NAPCO was subcontracted to do. (*Id.* at 29.) Moreover, Plaintiff points to the fact that NAPCO was planning to use a sub-subcontractor to do the actual erection of the parking garage. (*Id.* at 30.)

Defendant NAPCO replies that the contract is not hybrid but was instead one for construction services. (Doc. 90 at 5.) In support of its argument, NAPCO points out that Plaintiff was not bargaining for goods at all but was instead seeking a completed parking garage. (*Id.* at 6.) Furthermore, Defendant notes that Plaintiff's corporate representative testified that he understood that NAPCO was to "furnish construction services for this construction project[.]" (Doc. 84-1 at 17.) Defendant also contends that even if the court construes the contract as a hybrid, the

predominant purpose "was for the construction of a non-movable good—a parking garage." (*Id.* at 7.)

The court agrees with Defendant. The UCC is inapplicable to the contract before the court. The contract is not a hybrid as Plaintiff posits. (Doc. 87 at 27.) Plaintiff sought to purchase a parking garage. (Doc. 81 at 2.) There were no ancillary goods that would also be provided with the parking garage. Construing the individual concrete slabs that form the parking garage as goods would, as Defendant points out, make just about every contract for construction one for goods. (Doc. 90 at 6.) Simply because Defendant used something movable in its effort to produce a parking garage does not transform the contract from one for services into a requisition of goods or some combination of the two. *Cf. Mecanique C.N.C., Inc. v. Durr Environmental, Inc.*, 304 F. Supp. 2d 971, 977 (S.D. Ohio 2004) (Likewise "[t]he mere fact that a manufacturer utilizes its effort and expertise in producing a good does not mean that the buyer is purchasing those services instead of the good itself.").

Plaintiff's case citations to the contrary are unhelpful, as they mostly involve factual situations where the thing bargained for was a particular component, a movable good, which would be used by *another entity operating under a different contract* for construction. *See United States ex rel Bartec Indus., Inc. v. United Pacific Co.*, 976 F.2d 1274, 1277 (9th Cir. 1992) (contract was for provision of steel beams); *Belmont Indus., Inc. v. Bechtel Corp.*, 425 F. Supp. 524, 528 (E.D. Pa. 1976) (contract was for provision of steel and the court noted that the relevant contractor "had no contractual responsibility here related to the actual building of the container handling facility."); *U.S. Fidelity & Guaranty Co. v. North Am. Steel Corp.*, 335 So.2d 18, 21 (Fla. App. 1976) (contract was for provision of pipes); *Standard Structural Steel Co. v. Debron Corp.*, 515 F. Supp. 803, 809-10 (D. Conn. 1980) (contract was for the provision of steel, subcontractor had no erection

responsibilities); *Levinson Steel Co. v. Schiavone Constr. Co.*, 637 F. Supp. 164, 166 (S.D.N.Y. 1986) (contract for the sale of steel and the court explained that "Levinson was not responsible for the erection of the steel; that task was within the bailiwick of another subcontractor[.]"); *Generations Ranch L.L.C. v. Zarbock*, No. 1 CA-CV 10-0771, 2012 WL 161814 at *3-4 (Az. App. Jan. 19, 2012) (contract for the provision of modular barn parts that were optionally installed by the manufacturer); *Mecanique C.N.C., Inc.*, 304 F. Supp. 2d at 977 (contract was for the provision of ductwork and the court concluded that the installation service provided was incidental to the purpose "of procuring the necessary ductwork."). Here, Plaintiff's primary purpose was to procure a parking garage; that is emphatically not a movable good.

But even if the court were to consider the contract hybrid in nature, Plaintiff's argument fails. The core of the predominant purpose test asks what the buyer sought to purchase. *Den-Mat Corp.*, 276 P.3d at 791. The answer in this case is indisputable. Plaintiff Conco sought to purchase a completed precast concrete parking garage. (Doc. 81 at 2.) Plaintiff did not seek to purchase several unassembled concrete slabs. Indeed, were Defendant to have simply delivered unassembled concrete slabs to the job site, refused to perform further, and demanded payment, this court suspects that Plaintiff would be suing Defendant again. As a result, the court does not accept Plaintiff's implicit suggestion that the erection of the parking garage was only a small portion of the contract. (Doc. 87 at 29.) The building of the parking garage was the whole basis for the bargain. That renders the contract one for construction services, not goods. Accordingly, the UCC does not apply.[4]

---

[4] Plaintiff argues in its response to Defendant's motion for summary judgment, that even if the UCC does not apply by statute, the court can (and should) look to the UCC for "common law guidance." (Doc. 87 at 32.) Plaintiff cites a range of cases where courts have arguably extended principles embodied in the UCC to cases where the code is "technically inapplicable." (*Id.*) The court declines the invitation to muddy the waters distinguishing contracts governed by the UCC and those governed by the common law. Doing so would upset longstanding bedrock principles of contracts and societal reliance upon the contrast between the UCC and common law. Additionally, other, more typical sources of common law guidance, like on point Kansas case law, are readily available in this case.

### D.    The Offers

With this view of contract law in the background, the court moves to evaluate the parties' claims about the legal effect of the various negotiations and offers they exchanged.  The court organizes its analysis around Plaintiff's two theories of contract formation: first, that a contract was formed pursuant to the September 9, 2021 offer, and second, in the alternative, that a contract was formed on March 14, 2022.

#### 1.  *September 9, 2021*

The parties agree that on September 9, 2021, Defendant NAPCO's representative, Mark Carr, submitted a proposal for $1,698,260 to Plaintiff Conco for construction of the parking garage. (Doc. 81 at 3.)  That proposal also had an optional addition of a $227,570 ramp into the parking garage.  (*Id.*)  The parties also agree that the proposal contained various details, but most importantly contained a clause that stated, "the proposal is valid for 60 days." (*Id.*); *see also* (Doc. 91-10 at 7.)  This would place Conco's deadline for acceptance on November 8.  (Doc. 81 at 3.)

Plaintiff contends that Conco representatives told Carr that Conco "was using the September 9 Proposal to bid for the Prime Contract."  (Doc. 86 at 14.)  Defendant disputes this notion.  (Doc. 88 at 10.)  The citations in Conco's brief to support this claim are to the deposition of Conco's Trent Woodward and a declaration from Conco's Rob Davis.  (*Id.*)  Woodward's deposition indicates that Conco told *the project owner* not NAPCO, that Conco was using NAPCO's subcontract bid to formulate its prime contract bid.  (Doc. 86-6 at 80-83, 98-103.)  Particularly in Woodward's deposition, this seemed to have caused confusion.  (Doc. 86-6 at 80-82, 98-103.)  At most, Woodward's deposition may show a noncommittal answer about whether Conco verbally told NAPCO they were using their subcontract bid in preparation for bidding on the prime contract.  (Doc. 86-6 at 100.)  Davis' declaration does say that he told Carr Conco was

using NAPCO's proposal in preparing its bid, though it is devoid of specifics like the date and mode of communication.  (Doc. 86-7 at 4.)

Plaintiff also alleges that Rob Davis told Carr that "if Conco received the prime contract, NAPCO would receive a subcontract."  (Doc. 86 at 14.)  Defendant again disputes this notion. (Doc. 88 at 10.)  The cited portions of the Davis deposition reflect a belief, by Davis, that NAPCO knew they would be selected and that Conco had communicated that to them "many times", but as Defendant points out, the remainder of the line of questioning indicates that NAPCO was actively seeking confirmation that they would be the subcontractor on the project.  (Doc. 86-5 at 184-187.) Davis' declaration doesn't help much more, as it says, again without specifying when or how, that Davis told Carr that if Conco received the prime contract, NAPCO would receive the subcontract. (Doc. 86-7 at 4.)

Over the next couple of months Plaintiff and Defendant were actively communicating about Conco's prime contract bid.  (Doc. 86 at 15; Doc. 88 at 10.)  On November 18, 2021, Conco told Carr that contract negotiations were ongoing.  (Doc. 86 at 15-16; Doc. 88 at 11.)  Carr responded by asking for "NTP [notice to proceed] or Letter of Intent, or even just an email saying we are going to be doing this project with you?"  (Doc. 86 at 16; Doc. 88 at 11.)  Conco did not respond to NAPCO's request.  (Doc. 84 at 4; Doc. 87 at 14.)  Plaintiff argues this is because they had not yet been awarded the prime contract, so they were not in a position to issue a subcontract. (Doc. 87 at 14.)

On January 4, 2022, over a month after Conco had been awarded the project's prime contract, Conco told Carr that "[w]e now have a signed contract with the owner.  We are awaiting the release of [funding].  As soon as we have it, I'll issue you an LOI [letter of intent] while we finalize a subcontract."  (Doc. 86 at 17; Doc. 88 at 12.)  The following day, Davis responded

indicating that "it was great to hear." (*Id.*) On January 17, 2022, Conco told Carr via email that the funding had been approved, and construction could begin. (Doc. 86 at 18; Doc. 88 at 12.) Conco asked Carr to accept "this email as our letter of intent to award this project to you. Please begin [the detailed] design process ASAP." (*Id.*) But Conco added that as soon as Conco received NAPCO's revised price because of design changes, it would issue the subcontract. (Doc. 81 at 5; Doc. 84-11 at 2.)

Despite this, from January through mid-March of 2022, the parties continued to go back and forth over a delivery date for the parking garage. (Doc. 86 at 18-20; Doc. 88 at 12-14.) The parties dispute whether on March 14, 2022, they agreed upon a delivery date of August 8, 2022. (Doc. 86 at 20; Doc. 88 at 13-14.) Plaintiff contends that Carr offered the August 8, 2022 date, which Conco accepted. (Doc. 86 at 20.) They cite the Davis declaration and an exhibit. The Davis declaration does make the same contention, but in so doing, it cites to the same exhibit as Plaintiff's brief. (Doc. 86-7 at 7.) The exhibit is an email chain where the last entry is an email from Mark Carr to Conco asking if an August 8, 2022, delivery date could work. (Doc. 96-1 at 211.) There is no evidence to show Conco accepted that date. (*Id.*) Conco's Davis did say he was "going to proceed with this" (Doc. 96-1 at 211), but "this" references an earlier email in which Carr said, "Late July or after works, assuming at this point, it's not after mid-September." (*Id.*) Neither party has pointed the court to evidence that shows Plaintiff responded to, or accepted, Carr's offer of an August 8, 2022, delivery date. That offer came after Davis' email ("going to proceed with this") that Conco says shows acceptance. (Doc. 96-1 at 211.)

Conco's motion for summary judgment argues that the September 9, 2021, proposal was an "enforceable firm offer" when it was accepted. (Doc. 86 at 33-38.) NAPCO responds arguing

that the firm offer rule does not apply in this context, and even if it did, Plaintiff never accepted the offer.  (Doc. 88 at 32-36.)

> The merchant firm offer rule is a product of the UCC.  K.S.A. 84-2-205.  It provides that:
>
> An offer by a merchant to buy or sell goods in a signed writing which by its terms gives assurance that it will be held open is not revocable, for lack of consideration, during the time stated or if no time is stated for a reasonable time, but in no event may such period of irrevocability exceed three months; but any such term of assurance on a form supplied by the offeree must be separately signed by the offeror.

*Id.*  But this court has already determined that the UCC does not apply to this case.  Therefore, Plaintiff's firm offer contentions are without merit.  This returns the court to the common law principles of contracts.  There Plaintiff contends that the common law's "unfairness" led to the adoption of the UCC's rule.  (Doc. 86 at 34.)  At common law, an offer of a contract is "freely revocable by the offeror if the offeror has not received consideration."  (*Id.*)  According to Plaintiff, "[t]he unfairness of this result was that if the general contractor won the prime contract, it would be bound to honor its bid to the Project's Owner, even if, when the general contractor tried to accept the subcontractor's bid, the subcontractor withdrew."  (*Id.*) (citing 1 White, Summers, & Hillman, *Uniform Commercial Code* § 2:25 (6th ed. 2024)).  The trouble with this view is that the supposed "unfairness" can also be remedied, sans UCC, by the prime contractor paying the prospective subcontractor a sum as consideration to keep the offer open.  *Buena Vista Biomass Dev., L.L.C. v. Oneto Group, Inc.*, No. 08-CV-01011, 2008 WL 2693181 at *3 (E.D. Cal. July 2, 2008).  This is commonly called an option contract.  *Id.*  ("An option is a contract, made for consideration, to keep an offer open for a prescribed period, which is transformed into a contract of purchase and sale when there is an unconditional, unqualified acceptance by the optionee of the offer in harmony with the terms of the option and within the time span of the option contract.").

Conco did not pursue an option contract here, though it could have. As such, the court does not accept Conco's arguments that refusing to apply the UCC would be unfair.

But even if the firm offer rule did apply, Plaintiff's arguments still fail. First, Plaintiff attempts to clarify for the court the difference between the "period for irrevocability" with "the period the offer was open." (Doc. 86 at 37.) This distinction is of little moment here, because the offer's express terms said the proposal was only "valid for 60 days." (Doc. 91-10 at 7.) This language, particularly the term "valid", indicates that the offer self-terminated within 60 days.[5] This provision in NAPCO's offer, even if covered by the firm offer rule complies with the UCC's admonition that the offer will "be held open . . . during the time stated." K.S.A. 84-2-205. Neither party disputes that Conco could have accepted during this period. And for all its arguments on the UCC, Plaintiff never directly identifies for the court exactly when it accepted the September 9, 2021, proposal, either during the 60-day period or after. *See* (Doc. 84-2 at 25) ("Q. And it says that 'This proposal is valid for 60 days.' Did I read that correctly? A. Yes. Q. And this proposal was not accepted within 60 days; correct? A. No."). Rather, the aforementioned facts indicate the parties were still discussing due date, design, and price. This means Conco's actions cannot constitute acceptance. *Steele*, 552 P.2d at 962 ("Any expression of assent that changes the terms of the offer in any material respect may be operative as a counter-offer, but it is not an acceptance and constitutes no contract."). The offeror is the "master of the offer." *Wachter Management Co. v. Dexter & Chaney, Inc.*, 144 P.3d 747, 751 (Kan. 2006). Considering the above, the court holds that the September 9, 2021, proposal was just that, a proposal.

    *2. March 14, 2022*

---

[5] According to Black's Law Dictionary "valid" is defined as "Legally sufficient; binding." VALID, Black's Law Dictionary (12th ed. 2024). At the end of a period of validity, the offer would on its own terms become "invalid", which is defined as "Not legally binding." *Id.* at INVALID.

Separately, Plaintiff contends that if a contract was not formed under the September 9, 2021, proposal, it was separately formed on March 14, which as explained above, is when Plaintiff contends the parties agreed upon a delivery date. (Doc. 86 at 40.) Plaintiff goes even further however and argues that the parties had actually agreed upon all the essential terms by March 14. (*Id.*) Plaintiff then points to a number of communications that allegedly, when cobbled together, evidence a contract. (*Id.* at 41-42.) Plaintiff dismisses later "proposals" from NAPCO as "change orders." (*Id.* at 42.)

Defendant resists this argument. (Doc. 88 at 39-41.) Defendant contends that both parties continued to negotiate key terms after March 14. (*Id.* at 39-41.) Defendant bolsters this notion by explaining that both parties had an intent to reduce the terms to writing and according to Defendant, "when parties express an intent to enter into a written formal agreement, no enforceable contract exists until the execution of the formal agreement." (*Id.* at 40.)

The court agrees with Defendant. The factual circumstances simply do not indicate that the parties had reached a meeting of the minds on the "material or essential terms." *Monarch Build, L.L.C. v. DLH Holdings, L.L.C.*, 567 P.3d 831, 847 (Kan. Ct. App. 2025). As explained above, the formation of a contract requires "objective expression of assent rather than on the subjective intent of each party." *Id.* Certain facts can undermine a party's claim that the other party assented. *Unified School Dist. No. 446, Independence, Kansas v. Sandoval*, 286 P.3d 542, 547 (Kan. 2012). While the court declines to say as a matter of law, as Defendant argues, that when parties plan to reduce a contract to writing a contract is *never* formed until that writing is signed, this case certainly does not indicate a meeting of the minds prior to such a signature. *See* (Doc. 88 at 40) (citing *Short v. Sunflower Plastic Pipe, Inc.*, 500 P.2d 39, 75 (Kan. 1972); *Weil & Assoc. v. Urban Renewal Agency*, 479 P.2d 875, 884 (Kan. 1971)).

18

The following factual timeline compels this conclusion. On January 31, 2022, Carr submitted a new price to Conco of $1,996,894.48 with an optional addition for a mechanical room of $136,776.79. (Doc. 81 at 5.) Conco claims it "accepted NAPCO's new price." (Doc. 86 at 20.) In support of this fact, it cites the declaration of Robert Davis. While the declaration does say Davis "accepted NAPCO's revised price", as Defendant points out, there is nothing cited demonstrating this acceptance. (Doc. 86-7 at 7.) Conco also claims "the parties had agreed on NAPCO's scope of work, the price, and the delivery schedule." (Doc. 86 at 21.) It cites the Davis deposition in support, but Davis' statement is equivocal and states only that "in [his] opinion" a series of emails established the key terms. (Doc. 86-5 at 151-52.) As NAPCO avers, the deposition does not reference a specific email. (Doc. 88 at 15.)

On March 14, 2022, Mark Carr told Davis he would send a letter of intent for Conco's signature and said "we'll go to work while we await the subcontract for review and return to Conco." (Doc. 86 at 21; Doc. 88 at 15.) The following day, Carr sent a notice to proceed for Conco's signature; the notice was for "detailed construction design work." (Doc. 86 at 21; Doc. 88 at 15-16.) Conco also claims that NAPCO's notice was also a letter of intent that stated that Conco intended to enter into a contract with NAPCO for $1,996,895.00. (*Id.*) In support of this proposition Conco again cites the deposition of Robert Davis and an exhibit therefrom. (Doc. 91-13.) The exhibit confirms Conco's contention. The notice to proceed reads in relevant part:

> We understand CONCO Construction intends to enter into a contract with NAPCO Precast, LLC for the sum of $1,996,895.00 (One Million Nine Hundred and Ninety-Six Thousand, Eight Hundred and Ninety-Five Dollars). The $56,530.37 is for gravity loads, preliminary engineering and approval shop drawings are included in the contract amount.

(*Id.* at 2.) On March 16, 2022, Carr sent Davis the latest proposal via email. (Doc. 96-1 at 250.) In that same message Carr stated, "we'll follow up with a 'Letter of Intent' per your email received, (see attached), and begin the engineering and submittal process based on the latest information

19

sent on March 14, 2022 which is named and dated above in the subject line of this email notification." (*Id.*)

On March 21, 2022, Davis signed the previously mentioned notice to proceed related to design work and said "[s]ubcontract coming this week", in his email message. (Doc. 81 at 5.) On March 30, 2022, NAPCO told Conco it had accessed through Conco's project management software, the "proposed written subcontract, dated March 14, 2022." (Doc. 86 at 22; Doc. 88 at 16.) That same day a NAPCO employee Sam Younes told Conco's Davis he was "Glad to work again together on this project. Looking forward to a successful project together." (Doc. 96-1 at 277.)

Finally, on March 30, 2022, Carr internally emailed two other NAPCO employees stating "[w]e have been awarded the project by CONCO Construction Company." (Doc. 96-1 at 284.) The email also states that the "[anticipated delivery date]" was "delivery requested on August 8, 2022." (*Id.*) On April 1, 2022, Sam Younes announced to Davis and others that the "project has been officially transferred from Sales and estimating to project management department at Broken Arrow." (Doc. 91-14 at 2.) Younes' letter also noted that the "Production Start Date" and "Delivery Start Date" were "TBD based on a mutually agreed upon schedule." (*Id.*) Additionally, the production start date would not be "less than 5 weeks after contract execution." (*Id.*) From early April through mid-May the parties exchanged various communications relating to insurance and project design. (Doc. 86 at 22-23; Doc. 88 at 16.) Importantly, on April 15, 2022, Davis emailed Younes asking "[c]an you update me on the status of the subcontract?" (Doc. 96-2 at 5.) Younes advised Davis that the "contract is currently under review with our legal department." (*Id.*) Younes followed up on April 18, 2022, stating that "[r]efer to attached scope of work with Napco's comment for your review. Contract is currently under review with legal department and

will forward to you upon completion." (*Id.* at 4.) Davis apparently finished reviewing the documents submitted by NAPCO on May 2, 2022 and wrote: "[y]ou comment that 'NAPCO has reason to believe that production slot will be lost/shifted and deliveries will not be made per schedule.' Do you mean that you currently have reason to believe or that you are anticipating that there may be?" (*Id.* at 3-4.) That same day, Younes replied stating that the delivery date was "very challenging at this time for the following reasons: 1. Design just started and first submittal is schedule for 3rd week of May. 2. Contract is not executed. 3. Due to current available production slot, delivery on Lumen will not start until end of October if shop drawings are approved by Mid of July with an executed contract in place." (*Id.* at 2.) Davis, apparently frustrated by this response, forwarded this exchange back to NAPCO's Mark Carr saying "[t]his is not what we talked about. Conco has done nothing to delay the process. The contract is in your hands." (*Id.*)

On May 4, 2022, NAPCO's Sam Younes replied to a different email from Davis expressing concern about schedule and price, stating "[w]e will proceed with solid wall panel design as requested. Once the design is completed, Mr. Mark will revisit the estimate and reach out to you with final price. Concerning the contract review, I will check internally on return date from the legal department and update you." (Doc. 96-1 at 354.) That same day Davis wrote again to Carr "[w]e discussed August 8th and certainly not after September. Can design and production not meet your commitment?" (Doc. 86 at 25; Doc. 88 at 19.)

Davis sent another email to Carr on May 13, 2022, saying "[p]lease clarify. We agreed on a date that your people are telling me they cannot hit now, by a lot." (Doc. 96-2 at 135.) Carr replied the same day, explaining that NAPCO had experienced price increases "across the board." (Doc. 96-2 at 156.) Carr went on to say "[w]e know you have options but we hope ours is the option that makes the best sense for both the project and CONCO construction." (*Id.*) In response

Davis said that Conco would "address price increases that are reasonable and excessive. The schedule has me concerned. Why has it immediately slipped? Can you meet the August Delivery date?" (Doc. 91-4 at 2.)

On June 3, 2022, Younes followed up with Davis asking for "feedback" on NAPCO's comments to the subcontract. (Doc. 86 at 25; Doc. 88 at 20.) Around this same time NAPCO was communicating internally about whether the price increase had been communicated to Conco. (Doc. 96-2 at 192, 196, 198, 201.) On June 16, 2022, Younes forwarded Davis a "price increase change order . . . due to unforeseen cost increases just in the last few months." (Doc. 91-5 at 2.) Younes also advised Davis that NAPCO was "available to discuss any concerns you may have to finalize and execute the contract and lock a production slot to meet end of October start erection date." (*Id.*) From this point, the parties' communications about price and delivery date appear to become less frequent. By late July, NAPCO had not heard from Conco regarding feedback on its price increase. (Doc. 96-2 at 214.) NAPCO advised Conco on July 27, 2022, that absent feedback production would be delayed. (Doc. 96-3 at 2-3.) On July 29, 2022, NAPCO again notified Conco that without feedback by August 3rd, NAPCO would assume Conco did not want "to move forward" with the project. (Doc. 96-3 at 8.) Conco states at this point it began looking for alternative options for the parking garage. (Doc. 86-7 at 8.)

On August 19, 2022, NAPCO sent Conco a new proposal valued at $2,703,906.67. (Doc. 86 at 29; Doc. 97 at 7.) Conco wanted the parking garage finished by November 29, 2022. (Doc. 86 at 30; Doc. 88 at 25.) During a meeting between the parties on August 26, 2022, Conco's Robert Davis got the impression that NAPCO did not have the project scheduled for production. (Doc. 86 at 30; Doc. 88 at 25.) On September 9, 2022, Conco purported to terminate the subcontract with NAPCO for default. (Doc. 86 at 31; Doc. 97 at 7.)

As should be clear from this sequence of events, the parties did not form a binding contract on March 14, 2022, as Plaintiff suggests. "In an action based on contract, the burden of proof is on the plaintiff to show the existence of the contract alleged in the petition." *Steele*, 552 P.2d at 963. To repeat, to form a binding contract parties must evidence an "offer, acceptance, and consideration." *M West, Inc.*, 234 P.3d at 844. There must be a "meeting of the minds on all the essential terms. . . ." *Steele*, 552 P.2d at 962. "To constitute a meeting of the minds there must be a fair understanding between the parties which normally accompanies mutual consent and the evidence must show with reasonable definiteness that the minds of the parties met upon the same matter and agreed upon the terms of the contract." *Id.*

In this case, that meeting of the minds never happened. On March 14 itself, NAPCO told Conco that it would "await the subcontract for review and return to Conco." (Doc. 86 at 21; Doc. 88 at 15.) A day later NAPCO sent a notice to proceed on design work which contained the statement "We understand CONCO Construction *intends* to enter into a contract with NAPCO Precast, LLC for the sum of $1,996,895.00." (Doc. 91-13 at 2.) (emphasis added). On March 16, NAPCO said they would "follow up with a 'Letter of Intent' per your email received, (see attached), and begin the engineering and submittal process based on the latest information sent on March 14, 2022 which is named and dates above in the subject line of this email notification." (Doc. 96-1 at 250.) On March 21, Conco noted the subcontract was "coming this week." (Doc. 81 at 5.) On April 1, NAPCO in its letter to Conco and others noted the "Production Start Date" and "Delivery Start Date" were "TBD based on a mutually agreed upon schedule." (Doc. 91-14 at 2.) Additionally, the production start date would not be "less than 5 weeks after contract execution." (*Id.*)

On April 15, a full month after Conco claims the subcontract was enforceable, Conco contacted NAPCO asking "[c]an you update me on the status of the subcontract?" (Doc. 96-2 at 5.) On April 18, NAPCO contacted Conco asking that they "[r]efer to attached scope of work with Napco's comment for your review." (*Id.* at 4.) NAPCO added, "[c]ontract is currently under review with legal department and will forward to you upon completion." (*Id.*) On May 2, Conco inquired: "[y]ou comment that 'NAPCO has reason to believe that production slot will be lost/shifted and deliveries will not be made per schedule.' Do you mean that you currently have reason to believe or that you are anticipating that there may be?" (*Id.* at 3-4.) NAPCO replied saying that the delivery date was "very challenging at this time for the following reasons: 1. Design just started and first submittal is schedule for 3rd week of May. 2. Contract is not executed. 3. Due to current available production slot, delivery on Lumen will not start until end of October if shop drawings are approved by Mid of July with an executed contract in place." (*Id.* at 2.)

On May 4, NAPCO wrote "[w]e will proceed with solid wall panel design as requested. Once the design is completed, Mr. Mark will revisit the estimate and reach out to you with final price. Concerning the contract review, I will check internally on return date from the legal department and update you." (Doc. 96-1 at 354.) Also on May 4, Conco asked "[w]e discussed August 8th and certainly not after September. Can design and production not meet your commitment?" (Doc. 86 at 25; Doc. 88 at 19.) On May 13, NAPCO pleaded with Conco, "[w]e know you have options but we hope ours is the option that makes the best sense for both the project and CONCO construction." (*Id.*) On June 3, 2022, NAPCO asked Conco for "feedback" on NAPCO's subcontract comments. (Doc. 86 at 25; Doc. 88 at 20.) On June 16, NAPCO said it was "available to discuss any concerns you may have to finalize and execute the contract and lock a production slot to meet end of October start erection date." (Doc. 91-5 at 2.)

24

These facts indicate the parties never completed an agreement. Parties who are already in a subcontract typically do not, after the date of the subcontract's alleged effectiveness, plan to send a "letter of intent." (Doc. 96-1 at 250.) Likewise, parties to an existing subcontract typically do not inquire about the subcontract's "status" (Doc. 96-2 at 5), have the contract reviewed by their legal department (*id.* at 4), continue to negotiate the delivery date (*id.* at 2-4), or ask for feedback on "comments" to the subcontract. (Doc. 86 at 25; Doc. 88 at 20.) These actions show that there was no meeting of the minds on essential terms, in fact, key essential terms like price and delivery date remained up in the air. Even the scope of work remained subject to comments. (Doc. 96-2 at 4.) These actions all signal that the parties had not yet agreed. If that weren't enough, the court recognizes that the parties clearly intended to reduce their commitment to a writing, and that writing was never formed or executed. This also weighs against a finding of a contract. *See Sunflower Plastic Pipe*, 500 P.2d at 45. As a result of the foregoing, the court finds that even construing the facts in the light most favorable to Plaintiff, the totality of the circumstances does not exhibit the formation of a contract.

### E.    Promissory Estoppel

As a final argument, Plaintiff argues that in lieu of a finding that a contract existed between the parties, the court should find that NAPCO was prohibited from reneging on the terms of the deal under the doctrine of promissory estoppel. (Doc. 86 at 38-40.) Promissory estoppel "is 'an equitable doctrine designed to promote some measure of basic fairness when one party makes a representation or promise in a manner reasonable inducing another party to undertake some obligation or to incur some detriment as a result.'" *Peters v. Deseret Cattle Feeders, L.L.C.*, 437 P.3d 976, 984 (Kan. 2019) (quoting *Bouton v. Byers*, 321 P.3d 780 (Kan. Ct. App. 2014)). To prevail on such a claim, Plaintiff must show "(1) the promisor reasonably expected the promisee

to act on the promise, (2) the promisee acted as could reasonably be expected in relying on the promise, and (3) a refusal of the court to enforce the promise would sanction the perpetration of fraud or result in other injustice." *Mohr v. State Bank of Stanley*, 770 P.2d 466, 481 (Kan. 1989) (citing *Berryman v. Kmoch*, 559 P.2d 790 (Kan. 1977)).

Plaintiff contends it has met all of these elements.  (Doc. 86 at 39.)  Defendant argues that Plaintiff never "unequivocally" accepted Plaintiff's proposal as required by law and therefore, promissory estoppel cannot apply.  (Doc. 88 at 36.)  Defendant also claims that Plaintiff's purported termination of Defendant for default renders any promissory estoppel claim meritless. (*Id.* at 38.)  Finally, Defendant argues that since Plaintiff failed to timely accept the September 9, 2021, proposal, any reliance on that proposal was unreasonable.  (Doc. 88 at 39.)  The court agrees with Defendant.  The court finds that because Plaintiff never accepted the September 9, 2021, proposal or otherwise indicated its reasonable reliance upon it, Defendant must prevail on its defenses to promissory estoppel.

The parties seem to agree that the seminal promissory estoppel case *Drennan v. Star Paving*, 333 P.2d 757 (Cal. 1958), applies, though they disagree how.  (Doc. 86 at 35; Doc. 88 at 36.)  *Drennan* is a case about a prime contractor's reliance upon subcontractor proposals when bidding on the prime contract.  333 P.2d at 758-59.  While Kansas courts have not adopted *Drennan* and its rules formally, federal courts have predicted that they would.  *PKG Contracting, Inc. v. Smith & Loveless, Inc.*, No. 20-CV-2646-JAR, 2022 WL 1026889 at *5-6 (D. Kan. Apr. 6, 2022).  In *Drennan*, a subcontractor's proposal was used to compute a bid on a prime contract. 333 P.2d at 758-59.  But the subcontractor attempted to recant the bid because the cost was mistakenly too low.  *Id.*  The court held that there was no enforceable contract nor was there an option contract between the parties.  *Id.* at 759.  The court however, held that the subcontractor's

offer constituted a promise to perform. *Id.* Therefore, the subcontractor had "reason to expect that if its bid proved the lowest" it would be used by the prime contractor. *Id.* The court noted that "[h]ad [the subcontractor's] bid expressly stated or clearly implied that it was revocable at any time before acceptance, we would treat it accordingly." *Id.* But the subcontractor's bid in that case contained no revocation provision.

The court held that "[w]hen [the prime contractor] used [the subcontractor's] offer in computing his own bid, he bound himself to perform in reliance on [the subcontractor's] terms." *Id.* at 760. "[I]t is only fair that [the prime contractor] should have at least an opportunity to accept defendant's bid after the general contract has been awarded to him." *Id.* But the *Drennan* court added some qualifiers to its rule that are relevant here. "[A] general contractor is not free to delay acceptance after he has been awarded the general contract in the hope of getting a better price. Nor can he reopen bargaining with the subcontractor and at the same time claim a continuing right to accept the original offer." *Id.*

In applying *Drennan* to another case in the District of Kansas, Judge Robinson noted "[w]hen a general contractor reopens bidding with the subcontractor, promissory estoppel may be denied on several grounds, including lack of reliance or rejection by a counter-offer." *Smith & Loveless*, 2022 WL 1026889 at *5. It is now important to renew the maxim that a rejection by a counteroffer can occur merely when a party submits a conditional acceptance; that is, an acceptance that continues to negotiate certain terms. *Id.* at *6 ("Kansas courts also recognize the general rule that an acceptance of a contract must mirror the terms of an offer; a conditional acceptance is a counteroffer that rejects the original offer.").

Initially, the court notes that unlike in *Drennan*, NAPCO's September 9, 2021, offer was revocable, in fact automatically so, 60 days from September 9. (Doc. 91-10 at 7.) This would

indicate that under *Drennan*, promissory estoppel should not apply because Plaintiff's reliance on NAPCO's offer was no longer reasonable. 333 P.2d 759 ("Had [the subcontractor's] bid expressly stated or clearly implied that it was revocable at any time before acceptance, we would treat it accordingly.") Additionally, as Defendant points out, Conco's Robert Davis confirmed in his deposition that the offer was not accepted within 60 days. (Doc. 84-2 at 25.) But even disregarding that, the court holds that Plaintiff engaged in repeated negotiations with Defendant that should be construed as counteroffers, well after the date of its supposed reliance. 333 P.2d at 760.

First, as noted above, Conco received NAPCO's offer on September 9, 2021. (Doc. 81 at 3.) Second, Conco submitted its bid on the prime contract four days later on September 13, 2021. (Doc. 86 at 14; Doc. 88 at 10.) The project owner and Conco continued negotiating through November of 2021. (Doc. 86 at 15; Doc. 88 at 10.) This included "the revising and resubmitting of multiple proposals." (*Id.*) These proposals were at least submitted on September 24, November 3, and November 8. (Doc. 86 at 15; Doc. 88 at 11.) On November 18, 2021, NAPCO asked specifically for some written indication that Conco would use NAPCO as a subcontractor should Conco be awarded the prime contract. (Doc. 86 at 16; Doc. 88 at 11.) "Even just an email" would have sufficed. (*Id.*)

On December 2, 2021, Conco was awarded the project's prime contract. (Doc. 81 at 4.) On January 4, 2022, Conco notified NAPCO it had a signed contract with the owner. (*Id.*) Continued design development of the site required NAPCO to update its price to reflect the design changes. (Doc. 81 at 5.) On January 17, Conco asked NAPCO to accept an email as a letter of intent and to begin the detailed design process. (*Id.*) As soon as Conco received NAPCO's updated price they would "issue the subcontract." (*Id.*) In that same email, Conco requested

"Please clean up your number to eliminate the exterior ramp and place it internal." (Doc. 84-11 at 2.) Conco sent a draft subcontract the following day. (Doc. 86 at 18; Doc. 88 at 12.)

Between January and March 2022, both parties were unsure of the precise delivery date. (Doc. 86 at 18-20; Doc. 88 at 12-14; Doc. 97 at 5.) NAPCO offered an August 8 delivery date on March 14. (Doc. 86 at 20; Doc. 88 at 14.) That same day NAPCO also said it would forward a letter of intent and "go to work while we await the subcontract for review and return to CONCO." (Doc. 86 at 21; Doc. 88 at 15.) Discussions about the precise price continued for the next couple of days. (*Id.*) On March 15, NAPCO sent Conco a notice to proceed for the design work, a seemingly separate portion of the subcontract for which NAPCO was paid. (Doc. 91-13 at 2.) On March 21, Conco signed and returned this notice to proceed and explained "subcontract coming this week." (Doc. 86 at 21-22; Doc. 88 at 16.) NAPCO accessed Conco's proposed subcontract on March 30. (Doc. 86 at 22; Doc. 88 at 16.) But NAPCO's legal team would still review the subcontract and the parties would exchange comments for the next couple of months. (Doc. 86 at 23-26; Doc. 96-2 at 2-6; Doc. 88 at 17-20; Doc. 84 at 6; Doc. 87 at 20.)

These facts indicate an ongoing discussion and negotiation between the parties, despite Conco's use of NAPCO's initial proposal in its bid to the project owner. Therefore, under *Drennan*, but more importantly under basic common law principles, promissory estoppel cannot apply.

## IV.    Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment (Doc. 85), is DENIED and Defendant's motion for summary judgment (Doc. 83), is GRANTED.

IT IS SO ORDERED. Dated this 30th day of January, 2026.

s/ John W. Broomes
JOHN W. BROOMES
CHIEF UNITED STATES DISTRICT JUDGE